**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. _____

ANDREW DOYLE, ON BEHALF OF HIMSELF AND ALL OTHERS SIMILARLY
SITUATED,

    Plaintiff,

v.

TROY H. LOWRIE,
MARTIN A. GRUSIN,
ROBERT J. McGRAW, JR.,
MICHAEL L. OCELLO,
CAROLYN ROMERO,
GEORGE SAWICKI,
KENTON SIECKMAN,
DAVID LEVINE,
LOWRIE INVESTMENT MANAGEMENT, INC.,
LOWRIE MANAGEMENT, LLLP,
FAMILY DOG, LLC,
FD ACQUISITION CO. and
VCG HOLDING CORP.,

    Defendants.

---

**CLASS ACTION COMPLAINT**

---

Plaintiff, Andrew Doyle ("Plaintiff") on behalf of himself and all other similarly situated

shareholders of VCG Holding Corp. allege the following on information and belief, except as to

the allegations specifically pertaining to Plaintiff, which are based on personal knowledge.

## I.    <u>INTRODUCTION</u>

    1.    This is a class action brought on behalf of the public shareholders of VCG

Holding Corp. ("VCG" or the "Company") against Troy H. Lowrie, Martin A. Grusin, Robert J. McGraw, Jr., Michael L. Ocello, Carolyn Romero, George Sawicki, Kenton Sieckman, David Levine, Lowrie Investment Management, Inc., Lowrie Management LLLP, Family Dog, LLC, FD Acquisition Co., and VCG Holding Corp. This action arises from breaches of fiduciary duties by the Director Defendants (as defined below) in connection with a proposed "going private" transaction wherein the Chief Executive Officer and the Chief Operating Officer of the Company, who together control more than 30% of the Company's outstanding common stock, propose to purchase all outstanding common shares in exchange for consideration that is grossly inadequate and unfair to the shareholders (the "Proposed Transaction"). Plaintiff seeks injunctive and other appropriate relief relating to the alleged breaches of fiduciary duties.

2. On November 9, 2010, the Company filed a Form 8-K with the Securities and Exchange Commission ("SEC") to announce that it had entered into an Agreement and Plan of Merger (the "Merger Agreement") with Defendant Family Dog LLC, Defendant FD Acquisition Co., Defendant Troy Lowrie, the Company's Chairman of the Board and Chief Executive Officer, and Defendant Michael Ocello, the Company's President and Chief Operating Officer. Pursuant to the Merger Agreement, Defendants Lowrie and Ocello plan to acquire all outstanding shares of the Company's common stock at the price of $2.25 per share. The total cost to acquire all the outstanding shares of VCG common stock has been estimated at $25 million.

3. The members of the Company's Board of Directors, with Defendant Lowrie abstaining, voted unanimously to approve the Proposed Transaction and the Merger Agreement. The completion of the Proposed Transaction is subject to approval by a majority of the votes

entitled to be cast at a special meeting of the Company's shareholders at a date to be determined. The Company anticipates that the Proposed Transaction will close during the first quarter of 2011.

4.     The consideration offered to VCG shareholders is grossly inadequate and unfair from a financial point of view. Plaintiff alleges that he, along with all other public shareholders of VCG common stock, is entitled to enjoin the Proposed Transaction, or alternatively, to recover damages in the event that the Proposed Transaction is consummated.

5.     In pursuing their unlawful objective to squeeze out VCG's public shareholders, the Director Defendants have breached their fiduciary duties of loyalty, due care, independence, candor, good faith and fair dealing, and they have also aided and abetted such breaches by other VCG officers and directors. Although a Special Committee was formed by the Company to evaluate the Proposed Transaction, this committee is beholden to Defendant Lowrie and, thus, is not capable of a fair evaluation of the Proposed Transaction.

## II.     <u>JURISDICTION AND VENUE</u>

6.     This Court has personal jurisdiction over each defendant named herein because each defendant is either a corporation that is incorporated in, conducts business in, and maintains operations in the State of Colorado, or is a limited liability partnership or a limited liability company that is organized under, conducts business in and maintains operations in the State of Colorado, or is an individual who has sufficient minimum contacts with the State of Colorado so as to render the exercise of jurisdiction by the Colorado courts permissible under traditional notions of fair play and substantial justice.

7.     The claims asserted herein arise under Sections 14(a) and 20(a) of the Exchange

Act, 15 U.S.C. §§ 78n(a) and 78t(a), and the rules and regulations promulgated thereunder, including SEC Rule 14a-9, 17 C.F.R. § 240.14a-9 ("Rule 14a-9").

8.     This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa and 28 U.S.C. § 1331 because this is a civil action arising under the federal laws of the United States.

9.     The Court also has jurisdiction over this action pursuant to 15 U.S.C. §78bb(f)(3)(A)(i), because it is a class action based on the statutory or common law of Colorado, defendant VCG's state of incorporation, and thus may be maintained in federal court.  This Court has supplemental jurisdiction under 28 U.S.C. §1367.

10.     Venue is proper in this District pursuant to 28 U.S.C. §1391 because VCG is incorporated in Colorado and defendants include officers and/or directors of a Colorado corporation.

## III.     **PARTIES**

11.     Plaintiff is, and at all relevant times has been, an owner of shares of VCG common stock.

12.     Defendant VCG is a Colorado corporation headquartered at 390 Union Boulevard, Suite 540, Lakewood, Colorado, 80228.  The Company was incorporated in Colorado in 1998, and began its operations in April 2002.  VCG is an owner, operator, and consolidator of adult nightclubs throughout the United States.  The Company currently owns 19 adult nightclubs located in Anaheim, Indianapolis, St. Louis, Denver, Colorado Springs, Dallas, Raleigh, Minneapolis, Louisville, Miami, and Portland, ME. VCG common stock is traded on the NASDAQ stock exchange under the symbol "VCGH."

13.     Defendant Lowrie Management, LLLP, is a Colorado limited liability limited partnership, which formerly owned and operated adult entertainment nightclubs and is now an investment entity.  Lowrie Management, LLLP is controlled by Defendant Lowrie, who also serves as its President.  Lowrie Management, LLLP is deemed to beneficially own 4,394,100 shares of VCG common stock, which constitutes approximately 27.0% of the outstanding shares of VCG Common Stock.  Lowrie Management, LLLP has shared voting and dispositive power over all the shares it beneficially owns.  Lowrie Management, LLLP, has trademarked and registered several names and logos that it licenses to the Company for a fee.  Additionally, Lowrie Management, LLLP, is the landlord of several of the Company's nightclubs for which it receives substantial rent payments on long-term leases.

14.     Lowrie Investment Management, Inc., a Colorado corporation, is the General Partner of Lowrie Management, LLLP.  Defendant Lowrie serves as President of Lowrie Investment Management, Inc., which, by virtue of its relationship with respect to Lowrie Management, LLLP, may be deemed to beneficially own 4,394,100 shares of VCG common stock, which constitute approximately 27.0% of the outstanding shares of VCG common stock. Lowrie Investment Management, Inc. has voting and dispositive power of these shares on behalf of Lowrie Management, LLLP.

15.     Defendant Lowrie has been the Chairman of the Company's Board of Directors since April 2002 and its Chief Executive Officer since November 2002.  In addition, Lowrie is President of Lowrie Investment Management Inc., the General Partner of Lowrie Management, LLLP, a Colorado limited liability limited partnership, which formerly owned and operated adult entertainment nightclubs and is now an investment entity.  Lowrie was the owner and President

of International Entertainment Consultants, Inc., ("IEC") a company engaged in the business of managing adult entertainment nightclubs, from 1982 to October 2003, when it was acquired by the Company. As disclosed in the Company's Schedule 14a, filed with the SEC on April 30, 2010, Lowrie beneficially owns 4,943,289 shares of VCG common stock, or 30.3% of the outstanding shares, including, by virtue of his relationship with Lowrie Management, LLLP, 4,394,100 shares of common stock held by Lowrie Management, LLLP. Defendant Lowrie is a resident of the State of Colorado.

16. Defendant Martin A. Grusin, ("Grusin") has been a Director of the Company since July 2005. Grusin is not considered to be an independent member of the Board. Grusin is a resident of the State of Tennessee.

17. Defendant Robert J. McGraw, Jr., ("McGraw") has been a Director of the Company since November 2002. McGraw is a resident of the State of Colorado.

18. Defendant Michael L. Ocello, ("Ocello") has been President and Chief Operating Officer of the Company since April 2002. In addition, Ocello served on the Company's Board of Directors from April 2002 until he announced his resignation on October 31, 2010. Ocello is the owner and President of Unique Entertainment Consultants, Inc., of St. Louis, Missouri, a management company that has specialized in the management of nightclubs since 1995. Ocello has been affiliated with IEC in a managerial capacity since 1982. He is currently the President of IEC. Defendant Ocello is also the Managing Member of LTD Investment Group, LLC, a Missouri limited liability company that is used for Ocello's investment purposes. Ocello is the beneficial owner of 195,589 shares of VCG common stock, or approximately 1.1% of the outstanding shares, including, by virtue of his relationship with LTD Investment Group, LLC,

158,000 shares of VCG common stock held by LTD Investment Group, LLC. Ocello is a resident of the State of Missouri.

19. Defendant Carolyn Romero, ("Romero") was a Director of the Company from August 2009 until October 31, 2010. On September 10, 2010, Defendant Romero announced that she was resigning from her position on the Board of Directors in the middle of her term. She also served on the Special Committee which had been convened to evaluate the terms of the Proposed Transaction, as well as the special committees that were convened to evaluate prior offers made by Defendant Lowrie to purchase outstanding shares of the Company as described below. Romero is a resident of the State of Colorado.

20. Defendant George Sawicki, ("Sawicki") has been a Director of the Company since June 2008. Sawicki was considered to be an independent member of the Board of Directors and served on special committees convened to evaluate various offers to purchase the outstanding shares of the Company, including the Special Committee that was convened to evaluate the Proposed Transaction. Sawicki is a resident of the State of Colorado.

21. Defendant Kenton Sieckman, ("Sieckman") was a Director of the Company from June 2008 until June 30, 2010, when he resigned in the middle of his term. Defendant Sieckman was considered to be an independent member of the Board of Directors, and he served on special committees that had been convened to evaluate prior offers made by Defendant Lowrie and by a third party to purchase the outstanding shares of the Company as described below. Sieckman was replaced by Defendant James Levine. Sieckman is a resident of the State of Colorado.

22. Defendant James Levine ("Levine") has been a Director of the Company since July 9, 2010. He replaced Defendant Sieckman following Defendant Sieckman's resignation.

Defendant Levine served on the Special Committee that was convened to evaluate the terms of the Proposed Transaction.

23.     Defendants Lowrie, Grusin, McGraw, Ocello, Romero, Sawicki, Levine and Sieckman, are collectively referred to herein as the "Director Defendants."

24.     Defendant Family Dog, LLC ("Parent") is a Colorado limited liability company that is wholly owned and controlled by Defendant Lowrie.

25.     Defendant FD Acquisition Co. ("Subsidiary") is a Colorado corporation and is a wholly-owned subsidiary of Parent, and therefore of Defendant Lowrie, and was created for the sole purpose of effectuating the Proposed Transaction.

26.     Defendants Lowrie, Ocello, Lowrie Management LLLP, Lowrie Investment Management, Inc., Family Dog, LLC and FD Acquisition Co. are collectively referred to herein as the "Buyout Defendants."

27.     The Director Defendants, by reason of their corporate directorships and/or executive positions, are fiduciaries to and for the Company's stockholders, which fiduciary relationship requires them to exercise their best judgment, and to act in a prudent manner and in the best interests of the Company's stockholders.   The Director Defendants owe fiduciary duties, including good faith, loyalty, fair dealing, due care and candor to VCG and its shareholders.

28.     Each Director Defendant herein is sued individually, as a conspirator and aider and abettor, as well as in their capacity as an officer and/or director of the Company, and the liability of each arises from the fact that he or she has engaged in all or part of the unlawful acts, plans, schemes, or transactions complained of herein.

IV.     **CLASS ACTION ALLEGATIONS**

29. Plaintiff brings this action on their own behalf and as a class action pursuant to Federal Rule of Civil Procedure 23 on behalf of all shareholders of VCG (except defendants herein and any person, firm, trust, corporation or other entity related to or affiliated with any of the defendants) and their successors in interest, who have been or will be adversely affected by the conduct of defendants alleged herein.

30. This action is properly maintainable as a class action for the following reasons:

    a. The class of shareholders for whose benefit this action is brought is so numerous that joinder of all class members is impracticable. According to the Form 10-Q the Company filed with the SEC on August 9, 2010, there were 16,292,071 shares of VCG's common stock issued and outstanding. Upon information and belief, the Company's common stock is owned by thousands of shareholders of record scattered throughout the United States.

    b. A class action is superior to other methods for the fair and efficient adjudication of the claims asserted herein, and no unusual difficulties are likely to be encountered in the management of this action as a class action. The likelihood of individual class members prosecuting separate claims is remote.

    c. There are questions of law and fact which are common to members of the class and which predominate over any questions affecting any individual members. The common questions include, *inter alia*, the following:

        (i) Whether one or more of the defendants has engaged in a plan and

scheme to enrich themselves at the expense of VCG's public stockholders;

(ii)    Whether the Director Defendants have breached their fiduciary duties owed by them to Plaintiffs and members of the class, and/or have aided and abetted in such breach, by virtue of their participation and/or acquiescence and by their other conduct complained of herein;

(iii)   Whether Defendants have failed to fully disclose the true value of VCG's assets and earning power and the future financial benefits which the Buyout Defendants will obtain from the completion of the Proposed Transaction;

(iv)    Whether the Director Defendants have wrongfully failed and refused to seek a purchase of VCG at the highest possible price and, instead, have sought to chill potential offers and allow the valuable assets of VCG to be acquired by defendants Lowrie and Ocello at an unfair and inadequate price;

(v)     Whether the Buyout Defendants have induced or aided and abetted breaches of fiduciary duty by members of VCG's Board of Directors;

(vi)    Whether Defendants Lowrie and Ocello are engaging in self-dealing in connection with the Proposed Transaction;

(vii)   Whether Plaintiffs and the other members of the class will be

irreparably injured by the Proposed Transaction; and

(viii)     Whether Defendants have breached or aided and abetted the breaches of the fiduciary and other common law duties owed by them to Plaintiffs and the other members of the class.

(ix)     Whether Defendants violated the federal securities laws by, *inter alia*, failing to disclose all material information necessary to allow shareholders to make an informed decision of whether to vote to approve the Proposed Transaction.

31.     Plaintiff is committed to prosecuting this action and have retained competent counsel experienced in litigation of this nature. The claims of Plaintiff are typical of the claims of the other members of the class and Plaintiff has the same interest as the other members of the class. Accordingly, Plaintiff is an adequate representative of the class and will fairly and adequately protect the interests of the class.

32.     Plaintiff anticipates that there will not be any difficulty in the management of this litigation.

33.     For the reasons stated herein, a class action is superior to other available methods for the fair and efficient adjudication of this action.

34.     The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class, which would establish incompatible standards of conduct for the party opposing the Class.

35.     The defendants have acted, or refused to act, on grounds generally applicable to, and causing injury to, the Class and, therefore, preliminary and final injunctive relief on behalf of

the Class as a whole is appropriate.

## V.    SUBSTANTIVE ALLEGATIONS

36.    VCG is a consolidator and operator of adult nightclubs in the United States.  The Company owns, manages and acquires nightclubs, which provide premium live adult entertainment and upscale restaurant/beverage services in a first class environment.  The Company, through its subsidiaries, owns 19 adult nightclubs located in Colorado, California, Florida, Illinois, Indiana, Kentucky, Minnesota, North Carolina, Maine, and Texas, that offer live adult entertainment, restaurant and bar operations.

### A.    THE RESTATEMENT

37.    During 2007 and 2008, the Company engaged in an aggressive acquisition strategy that resulted in the purchase of 14 nightclubs.  During 2007 alone, the Company more than doubled in size by making strategic acquisitions of 11 nightclubs and growing to 18 nightclubs.  It acquired two additional nightclubs in 2008, and later sold one nightclub, resulting in its current total of 19 nightclubs.

38.    On December 9, 2008, the SEC issued a comment letter to the Company questioning its methodology for the valuation of certain assets and liabilities purchased in connection with these acquired nightclubs and the allocation of the purchase prices to those assets and liabilities.

39.    The Company had previously taken the position that its senior management had sufficient industry expertise to determine the fair value of intangible assets being acquired and that each of the nightclubs being acquired was not material enough to the Company's financial position to require an independent valuation.

40.     In response to the issues raised by the SEC's comment letter, the Company retained an independent firm to conduct a valuation of the assets and liabilities acquired in 2007 and 2008.

41.     The review determined that goodwill was overstated by $2.6 million, additional aid-in capital was overstated by $1.2 million and other income was overstated by $1.4 million. Also, the Company had not updated the valuation date and fair market value of the Company's stock consideration paid to Defendant Lowrie for the acquisition of his nightclubs when delays in transferring licenses postponed the effective acquisition dates. According to the Company, these errors were not previously detected due to the high volume of acquisitions and related equity and debt transactions during 2007.

42.     On March 25, 2009, the Audit Committee of the Board of Directors of the Company concluded that, upon the advice of management and in consultation with Causey Demgen & Moore, Inc., the Company's independent registered public accounting firm, the Company's previously issued financial statements for the fiscal year ended December 31, 2007 and the fiscal quarterly periods ended March 31, 2008, June 30, 2008 and September 30, 2008 required restatement. The announcement caused the stock price to drop to its 52 week low price of $1.42 per share.

43.     The restatement also caused harm to the Company in the form of drastically increased legal bills. In the Company's 2008 10-K/A, it stated "[l]egal fees increased by 63.6% to $1,101,000 for the year ended December 31, 2008 compared to the same period in 2007, and that "accounting fees also increased by $1,293,000 or 86.5% in 2008, from the previous amount of $1,495,000 in 2007. This includes an increase in audit fees." These increases were due in

large part to the costs associated with the SEC review and the Company's need to restate its financials.

44.     The Company also paid approximately $150,000 for a consultant to document accounting systems and controls and perform tests of internal controls to document compliance with the Sarbanes-Oxley Act of 2002.

**B.     THE STOCK REPURCHASE PLAN**

45.     On September 30, 2008, the Company announced that its Board had authorized the buyback of up to $1 million of the Company's publicly traded common stock.

46.     As part of the repurchase plan, the Company repurchased approximately 327,024 shares of common stock in the fourth quarter of 2008 through dealers or agents in transactions on the NASDAQ Stock Market or in privately negotiated transactions.

47.     On January 12, 2009, the Company's Board of Directors announced an additional share repurchase program of up to $1 million of VCG common stock.  From January 12, 2009 through March 12, 2009, VCG repurchased 193,025 shares of its common stock.

48.     On November 12, 2009, the Company announced that for the period of July 1, 2009 through September 30, 2009, the Company repurchased a total of 148,975 shares of common stock, and that for the first nine months of 2009, it repurchased a total of 399,501 shares of common stock.  According to a November 12, 2009 conference call with investors, the Company confirmed that the average price of the share buybacks was $2.21 per share.

49.     On March 12, 2010 in a Form 8-K announcing 2009 total year results, the Company reported that it purchased a total of 444,655 shares of common stock during 2009.

50.     On July 16, 2010, VCG sold its Jaguar's Gold Club in Fort Worth Texas to a

subsidiary of Rick's Cabaret International, Inc. ("Rick's Cabaret"). Consideration was $1 million cash and 467,497 shares of VCG common stock that had been held by Rick's Cabaret. Thus, in connection with the sale of Jaguar's Gold Club, VCG repurchased an additional 467,497 shares of its common stock.

51.     On August 9, 2010, the Company announced that it repurchased a total of 505,519 shares of VCG common stock during the second quarter of 2010.

52.     On November 12, 2010, in connection with its report of financial results for Q3 2010, the Company announced that

> Weighted average shares outstanding for the third quarter of 2010 declined by approximately 1.1 million or 6.1%, from the third quarter of 2009.  The decrease reflects the receipt, and subsequent retirement, of 467,497 shares of VCG common stock in connection with the sale of Jaguar's and the effect of the share repurchase plan.  The share repurchase plan was cancelled by VCG's Board of Directors in the second quarter 2010, due to the potential sale of the Company.

53.     These share buybacks had the result of decreasing the amount of shares that were publicly available to purchase, and thereby increased the intrinsic value of VCG's publicly traded common stock.

## C.     THE COMPANY'S POSITIVE RESULTS AND FUTURE PROSPECTS

54.     On March 27, 2009, the Company issued a positive press release announcing financial results for the 2008 fiscal year.  The press release touted 47% annual revenue growth and a significant decline in long-term debt.  The press release quoted defendant Lowrie as stating that:

> We are pleased with our operational performance for the full year, including revenue growth of more than 47% for 2008. Revenues in the fourth quarter of 2008 grew nearly 17.8%, despite the sluggish overall economy. A decline in revenues at our four "A" venues were offset by the performance at our "B" and "C" club locations, especially in areas where our clubs are clustered. We were

profitable for the full year of 2008 prior to the non-cash impairment charges and are comfortable that the legacy issues that led to these charges have been resolved. It is important to note these impairment charges do not affect the Company's cash balances or operating cash flows.

55.     Additionally, Lowrie stated that the Company was "continuing to explore

potential accretive acquisitions in markets where we currently operate and in new geographies."

56.     On April 13, 2009, the Company issued a press release announcing its filing of its

annual report with the SEC.  In the press release, Defendant Lowrie further commented on the

dramatic debt reduction:

We are continuing to reduce debt, primarily through principal prepayments and, where appropriate, extended maturity dates. Our efforts in these areas produced significant improvements in our balance sheet at December 31, 2008 when compared to December 31, 2007, including a $5.7 million reduction in current portion of long-term debt and a $4.0 million improvement in our working capital deficit.

57.     On May 14, 2009, the Company issued a press release announcing its result for

Q1 2009.  In the release, Defendant Lowrie raved about the Company's improved performance

and reiterated its aggressive growth strategy.  Lowrie stated in pertinent part:

Our performance for the first quarter included higher revenues, profitability, solid operating and free cash flows, and a strong balance sheet. Our high-amenity 'A' clubs continue to struggle in this sluggish economy, although their impact on overall operations was offset by performance at our 'B' and 'C' venues, increased service revenues, and the implementation of cost-savings initiatives across each of our locations. Our balance sheet at March 31, 2009 reflected cash of $2.8 million, a 25% increase from December 31, 2008. Operating cash flow for the first quarter was $1.7 million, free cash flow totaled $1.1 million, and we generated EBITDA of $2.4 million, or 18% of total revenue.

We remain optimistic about the future of our business and industry. We have been proactive in implementing strategies to mitigate the impact of the current economic environment, such as the creation of new club-level revenue streams, while continuing to benefit from our tiered-venue operating model. We are focused on achieving operating efficiencies throughout the organization. We remain confident in our ability to generate cash, and are committed to deploying

that cash to reduce debt and acquire shares. Where appropriate, we are exploring potential accretive acquisitions in markets where we currently operate and in new geographies.

58.     On August 12, 2009, the Company issued its Q2 2009 financial results.   In the press release, Defendant Lowrie continued to point to the Company's improved financial performance.   Lowrie stated:

> We remain optimistic about the future of our business and industry. We have been proactive in implementing strategies to mitigate the impact of the current economic environment, such as the creation of new club-level revenue streams, while continuing to benefit from our tiered-venue operating model. We are focused on achieving operating efficiencies throughout the organization. We remain confident in our ability to generate cash, and are committed to deploying that cash to reduce debt and acquire shares. Where appropriate, we are exploring potential accretive acquisitions in markets where we currently operate and in new geographies.

59.     This information was repeated on a conference call with analysts and investors held the same day.   Defendant Lowrie was optimistic about the Company's performance.   He stated on the call:

> Strong free cash flow and recent actions expected to enhance that free cash flow in the second half of 2009.   Various corporate issues and their associated expenses are winding down.   Our share repurchase program is continuing.   Our balance sheet is strengthened.   Total debt decreased by $1.7 million in Q2.
>
> ***
>
> In a still sluggish environment, you'll see that we think we had a very solid second quarter.   We generated revenues of approximately $14 million, with net income of approximately $760,000 or $0.04 per share, and EBITDA of $2.5 million or 18% EBITDA margin.
>
> ***
>
> Although we are still reviewing and acquiring new clubs, the most compelling acquisition opportunity in our opinion has been our own stock.   We repurchased 250,526 shares for the first six months of 2009.

60. On November 12, 2009, the Company announced its results for Q3 2009. In the press release accompanying its announcement, Defendant Lowrie stated,

> We achieved solid operating results for the third quarter and first nine months of 2009. Despite a challenging economic environment, we generated nearly $14.0 million in revenues for the third quarter. The elasticity of our tiered model – where a decline in revenues caused by fewer patrons at our high-amenity A clubs is offset by the increased margins generated at our more affordable B and C clubs – in combination with improved cost efficiencies throughout the Company has allowed us to remain profitable, produce EBITDA margins of 17.1%, and generate free cash flow of $3.8 million for the first nine months of 2009.

61. On March 12, 2010, the Company released its Q4 2009 and full year 2009 results. In connection with the release, Defendant Lowrie continued to express optimism about the Company's results: "In light of a still weak economic environment, we are pleased with our results for the 2009 fourth quarter and full year. . . . Same club revenues increased at four of our locations during the fourth quarter of 2009."

62. Defendant Lowrie further stated that the Company was "profitable for the full year," and that excluding non-cash impairment charges and advisory fees related to change in control, "cash from operations was $9.1 million and free cash flow was $3.6 million."

63. On May 14, 2010, the Company announced its results for Q1 2010. Defendant Lowrie stated:

> Our results for the first quarter of 2010 reflect our continued success at managing the business against our previously announced corporate initiatives. We reported a modest increase in revenues and net income, free cash flow, and a further reduction of long-term debt. At the top line, we saw the success of new club-level revenue streams such as increased table side services, wristband sales, and suite fees which do not have associated costs. Legal fees declined significantly from both the first quarter of 2009 and, on a consecutive quarterly basis, the three months ended December 31, 2009. We paid down an additional $1.7 million of long-term debt to $29.1 million at March 31, 2010. To put this reduction in context, we ended 2009 with $30.8 million of long-term debt, a $5.7 million reduction from $36.5 million at December 31, 2008. The debt reductions

completed during 2009 and the first quarter of 2010 are expected to produce annual interest savings of approximately $0.4 million in 2010. At March 31, 2010, VCG had access to liquidity of approximately $1.3 million and cash of $2.4 million.

Following the dissolution of the Special Committee in April 2010, the Board of Directors authorized the repurchase of up to $1.0 million of the Company's common stock. We view this as a reflection of our shared confidence in the long-term prospects of our business and industry. Our strategy during 2010 will continue to focus on generating free cash flow, optimizing the operations of our 20 gentlemen's clubs, buying back the Company's common stock as allowed, further reducing long-term debt and considering select acquisitions.

64.     On August 9, 2010, the Company announced its results for Q3 2010. In the accompanying press release, Defendant Lowrie stated:

We reported higher revenues during the second quarter of 2010, driven primarily by the continued success of our recently introduced club-level revenue streams, which offset a decline in sales of alcohol. During the first six months of 2010, 10 of our clubs reported same-store increases in revenue, as compared to 7 clubs in the same period last year. A $2.1 million accrual associated with a recent judgement involving legacy litigation . . . produced a loss for the three and six month periods of 2010. Absent this accrual, we operated profitably although results were impacted by higher salaries and wages, and increased legal fees. Cash flow from operations remained strong at $3.5 million. Subsequent to the end of the second quarter, we prepaid loans aggregating approximately $2.2 million. At June 30, 2010, VCG had access to liquidity of approximately $0.9 million and cash of $2.7 million.

65.     The Company also reported total revenue for the second quarter of 2010 as having increased to "$14.3 million from $14.0 million in the same quarter 2009, including an 11.6% increase in services, which reflected continued patron acceptance of table side services, wristband access to special areas, table dances, and suite fees, all of which were introduced company-wide in 2009."

66.     On November 12, 2010, the Company announced its results for Q3 2010. Defendant Lowrie stated:

19

We reported higher revenues during the third quarter of 2010, driven primarily by the continued success of our recently introduced club-level revenue streams, which offset a decline in sales of alcohol. During the three and nine months of 2010, fifteen and twelve of our clubs, respectively, reported same-store increases in revenue. . . . Cash flow from operations at September 30, 2010 was $5.7 million and free cash flow was $2.1 million. We used free cash flow and the $1.0 million cash proceeds from the sale of Jaguar's to reduce total debt at September 30, 2010 to $26.0 million from $30.8 million at December 31, 2009. At September 30, 2010, VCG had access to liquidity of approximately $1.1 million on our line of credit and cash of $2.4 million.

67.     In connection with its Q3 2010 results, the Company also reported that revenue increased to $14.4 million from $13.4 million in Q3 2009. Furthermore, there was a 19.8% increase in service revenue, and "EBITDA for the third quarter of 2010 rose to $3.4 million from EBITDA of $2.2 million in the third quarter of 2009."

68.     In addition, the Proxy Statement states that during an August 6, 2010 meeting the Special Committee noted that "***certain aspects of VCG's condition had improved somewhat***" since November 2009, when it had analyzed a prior proposal by Lowrie to acquire VCG, as described below.

### D.     PAST OFFERS TO ACQUIRE VCG BY DEFENDANT LOWRIE AND BY RICK'S CABARET

69.     On November 4, 2009, Defendant Lowrie and Lowrie's sister filed a Form 13D/A with the SEC that contained a proposal letter, dated November 3, 2010, and addressed to the VCG Board of Directors, offering to purchase the outstanding shares of common stock of VCG at a cash price of $2.10 per share ("First Proposal"). The First Proposal anticipated that defendant Lowrie would continue to serve as the Chief Executive Officer and Chairman of the Board of Directors of VCG.

70.     The First Proposal was manifestly unfair from a financial point of view, as

20

evidenced by the fact that the Company itself repurchased its shares during 2009 at an average price of $2.21 per share.

71.     In response to Defendant Lowrie's First Proposal, the Company announced on November 3, 2009, that the Board of Directors had formed a special committee, consisting of defendants Romero, Sawicki and Sieckman, to review and evaluate the First Proposal. Defendant Lowrie's proposal was subject to the approval of the special committee.

72.     On November 13, 2009, the Company announced that Defendant Lowrie was extending the date for the special committee to reach a determination on the First Proposal until December 4, 2009.

73.     On December 16, 2009, the special committee *rejected* Lowrie's proposal to acquire the outstanding share of VCG at $2.10 per share, stating:

> The Special Committee was formed in order to evaluate the proposal made by Troy Lowrie, the Company's Chairman and Chief Executive Officer, Lowrie Management, LLLP, an entity controlled by Mr. Lowrie, and certain other unidentified investors (collectively, "Lowrie"), to acquire all of the outstanding common stock of the Company for $2.10 per share in cash.     The Special Committee has informed Lowrie that it has determined, with input from its advisors, that *the terms of the Proposal are currently inadequate*.  In addition, the Special Committee has directed its financial advisors, North Point Advisors LLC, to contact any parties that had either previously expressed an interest or might potentially be interested in pursuing a transaction with the Company.

74.     On February 16, 2010, the Company entered into a letter of intent ("Letter of Intent") to "confirm the mutual intentions of Rick's Cabaret International, Inc., ["Rick's Cabaret"] a Texas Corporation, Troy Lowrie, an individual, and Lowrie Management, LLLP, a Colorado limited liability partnership and VCG Holding Corp., a Colorado corporation, regarding the acquisition by [Rick's Cabaret] of the outstanding shares of [VCG] and certain related transactions."  The Letter of Intent contemplated a stock-for-stock merger of VCG and

Rick's Cabaret. One analyst estimated that the value to VCG stockholders based on Rick's Cabaret's proposal was $45 million. VCG shareholders would be compensated in Rick's Cabaret common stock at various levels according to the following formula:

| Rick's Cabaret Stock Price | Exchange Ratio (# of Shares of VCG Common Stock to be Exchanged for One Share of RCI Common Stock) |
| --- | --- |
| $8.00-$10.00 per share | Rick's Cabaret Stock Price divided by $2.20 |
| $10.01-$11.00 per share | Rick's Cabaret Stock Price divided by $2.44 |
| $11.01-$12.00 per share | Rick's Cabaret Stock Price divided by $2.66 |
| $12.01-$13.00 per share | Rick's Cabaret Stock Price divided by $2.76 |
| $13.01-$14.25 per share | Rick's Cabaret Stock Price divided by $2.85 |
| $14.26-$16.50 per share | Rick's Cabaret Stock Price divided by $3.00 |
| $16.51-$17.06 per share | Rick's Cabaret Stock Price divided by $3.25 |
| $17.07-$19.95 per share | 5.25 shares of VCG Common stock to 1 share of Rick's Common stock |
| Greater than $19.95 per share | Rick's Cabaret Stock Price divided by $3.80 |

75. Also pursuant to the Letter of Intent, Rick's Cabaret was to acquire 5,770,197 of VCG common stock held or controlled by Lowrie for a purchase price of $2.44 per share. Defendant Lowrie was to receive additional compensation amounting to over $26.7 million.

76. Finally, the Letter of Intent contemplated that Defendant Lowrie would be employed by the merged entity on a consulting basis for a three-year term, with an annual salary of $333,333.33 and an expense allowance of $1,500 per month.

77. Following the announcement of the Letter of Intent, the price of VCG common stock soared, reaching levels as high as $2.89 on March 6, 2010, approximating the value that investors expected to get from the sale of their shares of VCG common stock to Rick's Cabaret, and in turn, that Rick's Cabaret placed on the value of VCG common stock.

78. On April 1, 2010, the Company announced that the Letter of Intent between Rick's Cabaret, VCG and Defendant Lowrie had expired on March 31, 2010 because the parties

were unable to enter into a definitive merger agreement. The Company never released any additional information to explain why it was unable to reach a definitive merger agreement with Rick's Cabaret. It is notable, however, that Defendant Lowrie was to be retained only on a consulting basis, and only for a period of three years, had the merger with Rick's Cabaret been consummated.

79. Following the announcement that the transaction with Rick's Cabaret would not be consummated, the price of VCG common stock declined precipitously, dropping from $2.40 on March 31, 2010 to $2.04 on April 1, 2010, and eventually dropping as low as $1.55 on June 15, 2010.

80. On April 30, 2010, the Company announced that the Board of Directors had authorized the repurchase of up to $1 million of the Company's common stock.

81. On June 14, 2010, the Company announced that Courtney Cowgill resigned as Chief Financial Officer effective June 11, 2010, reportedly "in order to pursue other business interests." The Company advised shareholders that Ms. Cowgill's responsibilities had been absorbed internally and by a financial consultant on an interim basis.

82. On July 2, 2010, the Company filed a Form 8-K advising shareholders that former board member Sieckman's resignation, which was effective as of June 30, 2010, caused the Company's Audit Committee to have only two members. In addition, as a consequence of Sieckman's resignation, a majority of the board's members was no longer independent. As a result, the Company was not in compliance with NASDAQ Marketplace Rule 5605(c)(2)(A), which requires listed companies to have at least three audit committee members, and NASDAQ Marketplace Rule 5605(b)(1), which requires that a majority of the members of boards of listed

companies be independent. The Company gave notice to NASDAQ of this non-compliance on June 29, 2010 in accordance with NASDAQ rules.

83. One week later, the Company announced that Levine joined the Board to fill the vacancy and complete Sieckman's term. According to VCG, the appointment of Levine brought the Company back into compliance with the requirements set forth in NASDAQ Market Place Rules 5605(b)(1) and 5605(c)(2)(A).

84. On July 20, 2010, Defendant Lowrie sent a letter to VCG's Board of Directors stating that he remained willing to acquire the outstanding shares of VCG common stock at the price of $2.10 per share ("the "Second Proposal"), which is the same price that was rejected by the Board of Directors on December 16, 2009.

85. Despite the fact that Defendant Lowrie stated in his proposal letter, "As you know, the Company announced on December 16, 2009 that the Special Committee of the Company, with input from its advisors, had determined the terms of the original proposal to be inadequate at the time. However, we continue to believe that the original terms and price are fair to the Company and its shareholders," there was no reason for him to believe that $2.10 was a fair price. Although VCG common stock was trading at depressed levels due to the failed merger with Rick's Cabaret, the financials of the Company remained strong as the Company continued to pay down debt and realized same-store increases in several of its clubs as compared to similar quarters in 2009. In addition, the Company had been engaged in a stock repurchase plan which had the effect of constricting supply of publicly traded shares and thus increasing demand. Therefore, the intrinsic value of the Company and of its common stock increased from the time Lowrie's First Proposal was rejected as inadequate in December 2009, and because

$2.10 was not a fair price then, it was *a fortiori* not a fair price in July 2010.

86.    Indeed, just a few months earlier when Defendant Lowrie was engaged in negotiations with Rick's Cabaret, he would not sell his shares of VCG common stock for less than $2.44 per share, plus additional compensation, demonstrating that he knew that $2.10 was inadequate consideration for VCG common stock.

87.    On July 21, 2010, in response to Lowrie's Second Proposal, the Company's Board of Directors formed a Special Committee consisting of directors who were independent and disinterested with respect to the Second Proposal.  The Special Committee retained North Point Advisors LLC ("North Point") as its financial advisor and Faegre & Benson LLP to serve as its legal counsel.   Serving on this Special Committee were Defendants Sawicki, Romero, and Levine, who had replaced Defendant Sieckeman following his resignation.

88.    On August 4, 2010, Lowrie notified the Special Committee that its time to review the Second Proposal was extended until August 20, 2010.

89.    On August 20, 2010, the Company issued a press release which stated that the Special Committee again ***rejected*** Defendant Lowrie's proposal to acquire all outstanding shares of VCG common stock for $2.10, citing such consideration as inadequate.  In particular, the press release stated:

> The Special Committee was formed in order to evaluate the proposal made by Family Dog, LLC, an entity affiliated with the Company's Chief Executive Officer, Troy Lowrie, and Lowrie Management LLLP (collectively, "Lowrie"), to acquire all of the outstanding common stock of the Company (other than the shares held by Lowrie, its affiliates, and certain other investors) for $2.10 per share in chase (the "Proposal").  The Special Committee has informed Lowrie that it has determined, with input from its advisors, that ***the terms of the Proposal are currently inadequate***.  In addition, the Special Committee has directed its financial advisors, North Point Advisors LLC, to begin to contact any parties that had either previously expressed an interest or might potentially be interested in

pursuing a transaction with the Company.

90.     Less than two weeks later, on September 3, 2010, defendant Romero, one of the Company's directors and a member of the Special Committee considering Lowrie's proposal, notified the Board of Directors of her intent to resign from her position as director, as a member of the special committee of the Board and as the chair and a member of the audit committee of the Board, effective October 31, 2010.  Defendant Romero's resignation caused the Company to be non-compliant (once again) with NASDAQ Marketplace Rule 5605(c)(2)(A), which requires listed companies to have at least three members on the audit committee.  The Company gave notice to NASDAQ of this non-compliance on November 1, 2010 in accordance with NASDAQ rules.

91.     Given that Defendant Romero was serving on a special committee reviewing a management-led takeover offer, her sudden resignation, absent explanation, is suspicious and places a dark cloud over the integrity of the process.  Indeed, the committee seat has not been filled by a new, independent candidate, or any candidate.

92.     On the same day that Defendant Romero's resignation became effective, defendant Ocello resigned from his role as a non-independent director of the Company.  He continued his role as President and Chief Operating Officer.  Mr. Ocello reportedly submitted his resignation in order for the Company to comply with NASDAQ Marketplace Listing Rule 5605(b)(2), which requires that listed companies have a majority of board members be independent.  Mr. Ocello is a long-time business associate of Mr. Lowrie.

93.     On October 17, 2010, the Special Committee held another meeting to consider a revised offer by Lowrie of $2.20 per share.  The Special Committee made a counter offer to

Lowrie of $2.50 per share.

94.     Following the October 17, 2010 meeting, the Special Committee was told that $2.20 per share was Lowrie's "last and best offer." The Special Committee stated that any approval of $2.20 per share would likely not be unanimous. The Special Committee explored the option of having a second investment bank evaluate the $2.20 offer for fairness, one whose fee was not heavily contingent on the issuance of a fairness opinion.

95.     On October 27, 2010, the Special Committee held a meeting. Lowrie had not raised his offer above $2.20 per share in response to the Special Committee's counteroffer of $2.50 per share. The Special Committee thus submitted another counter-offer of $2.30 per share, but it was contingent on obtaining a second fairness opinion.

96.     On November 2, 2010, Lowrie increased his offer to $2.25 per share, but stated that he was not willing to engage a second investment bank to evaluate the fairness of the offer.

**E.     THE PROPOSED TRANSACTION**

97.     On November 9, 2010, the Company announced that it had entered into a Material Definitive Agreement ("Merger Agreement") by and between VCG, Defendant Parent, Defendant Subsidiary, Defendant Lowrie and Defendant Ocello. Defendant Lowrie owns and controls Parent and Subsidiary.

98.     According to the Company's Form 8-K filed on November 9, 2010:

> Pursuant to the Merger Agreement, as of the effective time of the Merger, each issued and outstanding share of the Company's common stock . . . except for any shares of Common Stock held by Parent and Dissenting Shares (as such term is defined in the Merger Agreement) will be converted into the right ot receive a cash payment in the amount of $2.25 per share, without interest (the "Merger Consideration").

***

The Company's Board of Directors (with Troy Lowrie abstaining from voting) unanimously approved the Merger and the Merger Agreement following the unanimous recommendation of a special committee comprised entirely of independent members of the Company's Board of Directors (the "Special Committee"). Before the Company's Board of Directors unanimously approved the Merger and the Merger Agreement, the Special Committee received an opinion from an independent financial advisor to the effect that, based on and subject to the various assumptions and qualifications set forth therein, as of the date of such opinion, the Merger Consideration to be received by the Company's shareholders in the Merger is fair to such shareholders from a financial perspective.

The transaction is expected to close in the first quarter of 2011. Upon the closing of the Merger, the Company's common stock will no longer be traded on the Nasdaq Stock Market and the Company will cease reporting to the U.S. Securities and Exchange Commission. Certain members of the Company's management are expected to participate in the ownership of the Company following the closing of the Merger.

99. The Board of Directors unanimously approved the Proposed Transaction, with input from the Special Committee, which had received an opinion from its financial advisor that $2.25 per share of VCG common stock was fair and adequate consideration.

100. The members of the Special Committee were Defendants Levine, Romero and Sawicki. As noted, Defendant Romero announced her resignation from the Board of Directors, effective as of October 31, 2010, and the Company has still not replaced Defendant Romero with another individual to serve on the Company's Board of Directors. The Company has not disclosed whether it replaced Romero on the Special Committee, or whether she did or would have voted in favor of or against Lowrie's offering price of $2.25 per share of VCG common stock.

101. The Merger Agreement contains a termination fee, which requires the Company to pay a fee of $1 million or $600,000, depending on the circumstances, if the Company

terminates the Proposed Transaction under certain circumstances. For instance, under one scenario, VCG must pay a $1 million termination fee to the Buyout Defendants if it consummates any other acquisition proposal (as defined in the Merger Agreement) within twelve (12) months following the termination of the Merger Agreement.

102.     In addition, the Merger Agreement contains a restrictive "no shop" provision that bars VCG from considering alternative acquisition proposals by, *inter alia*, constraining VCG's ability to solicit or communicate with potential acquirers or consider their proposals. Specifically, the provision prohibits VCG from soliciting any alternative proposal but permits the Board to consider an unsolicited proposal only if it constitutes or is reasonably calculated to lead to a "Superior Acquisition Proposal" as defined in the Merger Agreement. However, even the Board's consideration of unsolicited proposals is restricted: prior to considering any such proposal, the Board must determine, in consultation with its financial advisors, that its fiduciary duties require it to consider the proposal. Thus, the Board cannot even consider alternative proposals even if it reasonably believes that such proposals would be beneficial to shareholders.

103.     Furthermore, no meaningful auction process ever occurred in an attempt to ensure the highest possible price per share was obtained for the shareholders. Despite the fact that, in rejecting Lowrie's Second Proposal, the Special Committee directed its financial advisors to contact any parties that had either previously expressed an interest or might potentially be interested in pursuing a transaction with the Company, upon information and belief, no attempts to contact any such parties were ever undertaken.

104.     Moreover, the Merger Agreement further reduces the possibility of a topping offer from an unsolicited purchaser. Here, the Company agreed to provide the Buyout Defendants

information in order to match any other offer, thus providing the Buyout Defendants with access to the unsolicited bidder's financial information and giving the Buyout Defendants the ability to top the superior offer. Thus, a rival bidder is not likely to emerge with the cards stacked so heavily in favor of the Buyout Defendants.

105. The Proposed Transaction is rife with conflict. The Buyout Defendants collectively own or control 31.54% of the outstanding shares of VCG common stock. As they control such a large stake in the Company, shareholder approval of the Proposed Transaction is likely to occur.

106. In addition, pursuant to the Merger Agreement, Defendant Lowrie will retain his positions within the Company following the consummation of the Proposed Transaction. This is in contrast to the fact that, had the transaction with Rick's Cabaret been consummated, Defendant Lowrie would have been employed only on a consulting basis, and only for a period of three (3) years.

107. The purpose of the Proposed Transaction is to enable the Buyout Defendants, and in particular Defendant Lowrie, to obtain one hundred percent (100%) equity ownership of the Company and its valuable assets for their own benefit at the expense of the Company's public stockholders – who will be deprived of their equity investment and the benefits thereof including, among other things, the expected growth in the Company's profitability.

108. The terms of the Merger Agreement are grossly unfair to the Company's shareholders. Although it appears that the Buyout Defendants increased the consideration they were offering for the Company's outstanding shares, in fact, because the Company had been aggressively repurchasing its shares and thus decreasing their supply on the open market and

increasing their intrinsic value, the $2.25 price per share did not represent an increase in consideration over the $2.10 offer made in July 2010. Instead, the offering price of $2.25 per share is the same as, or lower than, the $2.10 per share that the Company's Board of Directors had twice rejected in December 2009 and in August 2010.

109. The consideration to be paid to VCG's public stockholders is grossly unfair, inadequate, and substantially below the fair or inherent value of the Company. VCG's stock has already traded at a premium to the $2.25 per share offer, which does not, in fact, represent an increase in the value of the consideration offered when taking into account the fact that the Company has been aggressively repurchasing its outstanding stock, and the fact that "certain aspects of VCG's condition had improved somewhat" since 2009. Because the Board of Directors has twice rejected Lowrie's offers of $2.10, it should have also rejected an offer of $2.25 per share, which is not an improvement to the $2.10 offer.

110. In fact, there is considerable evidence that the Special Committee itself did not consider the price of $2.25 per share to be fair. The Special Committee had initially made a counter-offer to Lowrie of $2.50 per share. The Special Committee, bidding against itself, lowered that to $2.30 per share, but only if a second fairness opinion were also obtained. However, when Lowrie refused to pursue a second fairness opinion in connection with his $2.25 offer, the Special Committee acquiesced to these demands, a result that is absurd considering it had formerly believed a second fairness opinion was necessary to approve the higher ($2.30 per share) proposal.

111. In addition, Rick's Cabaret had offered to purchase the stock for values greatly exceeding $2.25 per share, as evidenced by the fact that VCG common stock was trading as high

as $2.89 per share following announcement of the deal with Rick's Cabaret in March 2010, thus suggesting that the intrinsic value of the shares of VCG common stock is closer to $2.89 per share. Indeed, while Defendants have estimated that the cost to acquire the public shares of VCG common stock under their proposal is $25 million, at least one analyst estimated that under Rick's Cabaret's deal, the value to the public shareholders would have been approximately $45 million. There is nothing in the Company's financials that suggests that the intrinsic value of the Company declined between March 2010 and November 2010. To the contrary, the financial markers indicated improvement and positive growth prospects for the Company.

112. VCG's current trading price is depressed and reflects a structural weakness in the price of VCG shares caused by the failed merger with Rick's Cabaret. Following the announcement of the transaction with Rick's Cabaret, the price of VCG common stock rose as high as $2.89 per share on March 2, 2010, indicating the value investors expected to receive from the transaction with Rick's Cabaret, and in turn, the value that Rick's Cabaret placed on VCG common stock. However, once it was announced that a definitive merger agreement could not be consummated with Rick's Cabaret, the price of VCG common stock dropped precipitously, falling from $2.40 on March 31, 2010 to $2.04 on April 1, 2010, and eventually dropping as low as $1.55 on June 15, 2010.

113. The Buyout Defendants, through the Proposed Transaction, are taking advantage of the structural weakness in the price of VCG common stock that was caused by the fact that the contemplated transaction was not consummated with Rick's Cabaret. The failed merger with Rick's Cabaret led the market to believe that shares of VCG common stock were "illiquid," and thus the value of VCG's common stock was depressed. Furthermore, many investors who

purchased the VCG common stock solely upon the announcement of the transaction with Rick's Cabaret sold their stock in light of the failed merger, further depressing the price of VCG common stock.

114.     The Company never revealed any information concerning the reasons why it was unable to achieve a definitive merger agreement with Rick's Cabaret, and thereby deprived its investors of material information which would have enabled them to evaluate whether VCG common stock was truly illiquid or not, and would have shed substantial light in enabling them to determine the intrinsic value of VCG common stock.

115.     The Proposed Transaction is wrongful, unfair and harmful to VCG's public stockholders, the class members.  In essence, the deal represents an attempt by the Defendants to aggrandize the personal and financial positions and interests of the Buyout Defendants at the expense of the stockholders of the Company.

116.     By the acts, transactions, and courses of conduct alleged herein, defendants, individually, as part of a common plan and scheme, and/or aiding and abetting one another in total disregard of their fiduciary duties, are attempting to deprive Plaintiffs and the class of the true value of their investment in the Company.  Under the circumstances, however, the Director Defendants are obligated to explore all alternatives to maximize shareholder value.

**F.     MATERIAL OMISSIONS IN THE PROXY STATEMENT**

117.     On December 23, 2010, the Company filed a Form 14A Preliminary Proxy Statement ("Proxy Statement") with the Securities and Exchange Commission, which announces that there will be a special meeting of VCG Holding's stockholders, at which they will be asked by the Company to vote to adopt the Proposed Transaction.

118. As set forth below, the Proxy Statement omits material information about the Proposed Transaction that must be disclosed to VCG Holdings' shareholders in order for them to make a fully informed decision as to whether to vote to approve the Proposed Transaction. This omitted information, if disclosed, would significantly alter the total mix of information available to them.

(a) North Point Advisors provided a fairness opinion to the Special Committee for, what the Proxy Statement termed, "a significant contingent transaction fee." However, the Proxy Statement did not disclose the amount of the contingent transaction fee, or what the fee was contingent upon, or whether there was and the amount of any fee that was not contingent on the transaction.

(b) As noted, the Special Committee had rejected an offer by Lowrie of $2.10 per share because it was deemed "inadequate." However, the Proxy Statement does not disclose why $2.10 per share was inadequate compensation.

(c) The Proxy Statement states that "certain aspects of VCG's condition had improved somewhat since the time of" Mr. Lowrie's $2.10 per share offer in 2009. However, the Proxy Statement does not disclose what aspects of VCG's condition had improved, nor how those improved conditions would affect what could reasonably be deemed fair compensation for the VCG shareholders.

(d) The Proxy Statement discloses that in October 2010, the Special Committee considered a revised offer from Mr. Lowrie of $2.20 per share, and that it made a counter-offer of $2.50 per share. However, the Proxy Statement does not disclose how the Special Committee arrived at the counter-offer of $2.50 per share,

including any of the factors or financial information it evaluated to arrive at this counter-offer.

(e) The Proxy Statement discloses that, following Lowrie's rejection of the Special Committee's counter-offer of $2.50 per share, the Special Committee made an additional counter-offer of $2.30 per share, but this was conditioned on obtaining a second fairness opinion from an advisor other than North Point. However, the Proxy Statement does not disclose how the Special Committee arrived at the counter-offer of $2.30 per share, nor why it was willing to lower the counter-offer with no movement from Lowrie's offer of $2.20 per share.

(f) The Proxy Statement discloses that Mr. Lowrie was willing to raise his offer to $2.25 per share, but was not willing to subject such offer to a second fairness opinion from a firm other than North Point. The Special Committee ultimately accepted Mr. Lowrie's proposal. However, the Proxy Statement does not disclose why the Special Committee was now willing to waive the second fairness opinion which it had previously thought was necessary in connection with a $2.30 per share offer, other than to state that Mr. Lowrie did not want to subject the transaction to further delay.

(g) North Point performed certain analyses based on "comparable companies," in two categories: entertainment and restaurant. North Point believed that the restaurant companies were "more comparable to VCG," and thus provides detailed information only concerning those companies. However, the Proxy Statement did not provide an explanation for why the restaurant companies were "more

comparable," nor did it provide any detailed information concerning the entertainment companies.

(h)     North Point performed a discounted cash flow analysis based on projections provided by management, as well as projections based on "downside" and "upside" scenarios. However, the Proxy Statement did not provide any financial information based on management's scenarios, nor on the "downside" and "upside" scenarios.

(i)     VCG's management provided financial data to North Point. However, no information was provided concerning this financial information or how it was used by North Point. For example, no information was provided concerning whether VCG management provided 3 year, 5 year or 10 year projections, a "best case" and a "worst case" scenario, or any other information about the VCG data. In addition, there are no disclosures to explain how VCG's management's data and projections compared to North Point's projections, or whether they used a "best case" or a "worst case" scenario in their analyses.

(j)     Although the Proxy Statement discloses information concerning the proposed deal with Rick's Cabaret, it does not provide any reason why no definitive acquisition agreement had been executed by the parties.

(k)     Although the Proxy Statement discloses that VCG management purchased an aggregate of 551,155 shares of VCG common stock in June and July 2010, it did not disclose what the effect of this repurchase program was on the inherent value VCG common stock based on the decrease of available shares in the market.

## VI.    DEFENDANTS' FIDUCIARY DUTIES

119.    In light of the foregoing, the Director Defendants have breached their fiduciary duties to maximize stockholder value and have not fully informed themselves about whether greater value can be achieved through the sale of the Company to a third party in a manner designed to obtain the highest possible price for VCG's public stockholders and without placing the Company's balance sheet at risk.

120.    The Director Defendants' fiduciary obligations under these circumstances require them to:

a.    Undertake an appropriate evaluation of VCG's worth as a merger or acquisition candidate or in liquidation;

b.    Take all appropriate steps to enhance VCG's value and attractiveness as an acquisition candidate;

c.    Engage in a meaningful auction with third parties in an attempt to obtain the best value for VCG's public shareholders;

d.    Act independently so that the interests of VCG's public shareholders will be protected and enhanced;

e.    Adequately ensure that no conflicts of interest exist between Defendants' own interests and their fiduciary obligations to maximize stockholder value or, if such conflicts exist, to ensure that all conflicts be resolved in the best interest of VCG public stockholders;

f.    Undertake a valuation of the liquid value of VCG's assets were they to be

disposed of piecemeal in a liquidation auction; and

g.      Disclose fully and completely all material information during consideration of the Proposed Transaction.

121.    The terms of the Proposed Transaction as now proposed are unfair to the class, and the unfairness is compounded by the disparity between the knowledge and information possessed by the Director Defendants by virtue of their positions of control of VCG and that possessed by VCG's public shareholders.

122.    The Director Defendants' failure to reject the facially inadequate Proposed Transaction evidences their disregard for ensuring that shareholders receive adequate value for their stock.

123.    Defendants owe fundamental fiduciary obligations to VCG's stockholders to take all necessary and appropriate steps to maximize the value of VCG common stock. The Director Defendants have the responsibility to act independently so that the interests of the Company's public stockholders will be protected and to consider properly all *bona fide* offers for the Company and to immediately reject offers that are clearly not in the interest of shareholders, but instead, have been designed to benefit long-time board members. Further, the directors of the Company must adequately ensure that no conflict of interest exists between the Director Defendants' own interests and their fiduciary obligations to maximize stockholder value or, if such conflicts exist, to ensure that all such conflicts will be resolved in the best interests of the Company's stockholders.

124.    Because the Director Defendants dominate and control the business and corporate affairs of VCG and because they are in possession of private corporate information concerning

the Company's assets, businesses and future prospects, (especially Defendants Lowrie and Ocello) there exists an imbalance and disparity of knowledge and economic power between defendants and the public stockholders of VCG. This discrepancy makes it grossly and inherently unfair for the Board of Directors to have approved the Proposed Transaction.

125.     The Director Defendants have breached their fiduciary and other common law duties owed to Plaintiff and the members of the Class, in that they have not and are not exercising independent business judgment and have acted to the detriment of the Class.

126.     Plaintiff seeks preliminary and permanent injunctive and declaratory relief preventing Defendants from inequitably and unlawfully depriving VCG stockholders of their rights to realize a full and fair value for their stock at a premium over the market price and to compel defendants to carry out their fiduciary duties to maximize shareholder value.

127.     Only through the exercise of this Court's equitable powers can VCG stockholders be fully protected from the immediate and irreparable injury which Defendants' actions threaten to inflict.

128.     Unless enjoined by the Court, Defendants will continue to breach their fiduciary duties owed to VCG stockholders and will not only prevent the sale of VCG at a substantial premium, but will also facilitate the sale at an unfair price to a pre-ordained buyer, all to the irreparable harm of Plaintiff and the other VCG public shareholders.

## COUNT I

### CLASS CLAIM FOR BREACH OF FIDUCIARY DUTY
### AGAINST VCG AND THE DIRECTOR DEFENDANTS

129.     Plaintiff repeats and realleges each allegation set forth herein.

130.     The Director Defendants are knowingly or recklessly and in bad faith violating

fiduciary duties of care, loyalty, good faith, candor and independence owed to the public shareholders of VCG and have acted to put their personal interests ahead of the interests of VCG shareholders.

131.    By the acts, transactions and courses of conduct alleged herein, the Director Defendants, individually and as a part of a common plan, have acted knowingly or recklessly and in bad faith.

132.    The Director Defendants have knowingly or recklessly and in bad faith violated their fiduciary duties by approving the Proposed Transaction without regard to the fairness of the transaction to VCG shareholders and by failing to disclose all material information concerning the Proposed Transaction to such shareholders.

133.    As demonstrated by the allegations above, the Director Defendants are knowingly or recklessly failing to exercise the care required, and breaching their duties of loyalty, good faith, candor and independence owed to the shareholders of VCG because, among other reasons:

    a.    they are taking steps to avoid competitive bidding, to cap the price of VCG stock and to give the Buyout Defendants an unfair advantage, by, among other things, failing to solicit other potential acquirers or alternative transactions;

    b.    they are ignoring or are not protecting against the numerous conflicts of interest resulting from the directors' own interrelationships or connection with the Proposed Transaction; and

    c.    they are failing to disclose all material information that would permit VCG stockholders to cast a fully informed vote on the Proposed Transaction, including both financial information and regulatory information which may materially

affect the Company and the its shareholders.

134.     Because the Director Defendants dominate and control the business and corporate affairs of VCG, and are in possession of private corporate information concerning VCG's assets, business and future prospects, there exists an imbalance and disparity of knowledge and economic power between them and the public shareholders of VCG which makes it inherently unfair for them to pursue any proposed transaction wherein they will reap disproportionate benefits to the exclusion of maximizing stockholder value.

135.     By reason of the foregoing acts, practices and course of conduct, the Director Defendants are knowingly or recklessly and in bad faith failing to exercise ordinary care and diligence in the exercise of their fiduciary obligations toward Plaintiffs and the other members of the Class.

136.     Unless enjoined by this Court, the Proposed Transaction will be consummated and the public shareholders of VCG common stock will be irreparably harmed by virtue of the fact that they will have been deprived of the true inherent value of VCG stock.

137.     Defendants Lowrie and Ocello are engaging in self-dealing, are not acting in good faith toward VCG shareholders, and have knowingly and recklessly breached their fiduciary duties to VCG stockholders by failing to ensure that the price per share of VCG common stock was maximized.

138.     As a result of the Director Defendants' unlawful actions, VCG common stockholders have been and will continue to be harmed in that they have been deprived of a fair sales process.   Unless the Proposed Transaction is enjoined by the Court, the Director Defendants will continue to knowingly or recklessly and in bad faith breach their fiduciary duties

owed to VCG common stockholders.

139.     Plaintiffs and the members of the Class have no adequate remedy at law.  Only through the exercise of this Court's equitable powers can VCG stockholders be fully protected from the immediate and irreparable injury which the Director Defendants' actions threaten to inflict.

## COUNT II

## CLASS CLAIM FOR AIDING AND ABETTING BREACH OF FIDUCIARY DUTIES AGAINST THE BUYOUT DEFENDANTS

140.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

141.     The Buyout Defendants knowingly aided and abetted the Director Defendants in breaching their fiduciary duties owed to the public shareholders of VCG, including Plaintiffs and the members of the Class.

142.     The Director Defendants owed to Plaintiffs and the members of the Class certain fiduciary duties as fully set forth herein.

143.     By committing the acts alleged herein, the Director Defendants breached their fiduciary duties owed to Plaintiff and the members of the Class.

144.     The Buyout Defendants colluded in or aided and abetted the Director Defendants' breaches of fiduciary duties, and were active and knowing participants in the Director Defendants' breaches of fiduciary duties owed to Plaintiff and the members of the Class.

145.     The Buyout Defendants participated in the breach of the fiduciary duties by the Director Defendants for the purpose of advancing their own interests.  The Buyout Group Defendants are attempting to obtain both direct and indirect benefits from aiding and abetting the

Director Defendants' breaches.

146.     Plaintiff and the members of the Class shall be irreparably injured as a direct and proximate result of the aforementioned acts.

## COUNT III

### CLASS CLAIM FOR VIOLATIONS OF 14(a) OF THE EXCHANGE ACT

147.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.  For purposes of this claim, Plaintiff expressly excludes and disclaims any allegation that could be construed as alleging or sounding in fraud or intentional or reckless misconduct.  This claim is based solely on negligence.

148.     The Proxy Statement, documents attached thereto and/or incorporated by reference therein described above contained misstatements of material facts and omitted material facts required to be stated in order to make the statements contained therein not misleading.

149.     Defendants named in this count, jointly and severally, solicited and/or permitted use of their names in solicitations contained in the Proxy Statement.

150.     VCG is the issuer of the Proxy Statement.

151.     Defendant Sawicki signed the Proxy Statement and intends to use it to solicit the votes of shareholders to approve the Proposed Transaction.

152.     The VCG Board of Directors permitted the use of their names by, among other things, allowing the Proxy Statement to represent that they recommend the Proposed Transaction.

153.     By means of the Proxy Statement and documents attached thereto or incorporated by reference therein, Defendants seek to secure Plaintiff's and other Class members' approval of

the Proposed Transaction and to solicit proxies from Plaintiff and other members of the Class.

154.    Each Defendant named in this Count acted negligently in making false and misleading statements of material facts, omitting material facts required to be stated in order to make the statements contained therein not misleading.

155.    Should the Proposed Transaction be consummated, the Proxy Statement will have been an essential link in such consummation by virtue of the shareholders' approval.

156.    Plaintiff and Class members eligible to vote on the Proposed Transaction have, to date, been denied the opportunity to make an informed decision in voting on the Proposed Transaction and have been damaged as a direct and proximate result of the untrue statements and omissions set forth herein.

157.    This claim is brought within the applicable statute of limitations.

158.    By reason of the foregoing, the Defendants named in this Count violated Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a), and Rule 14a-9 promulgated thereunder, 17 C.F.R. 240.1.14a-9.

159.    Plaintiff has no adequate remedy at law.

## COUNT IV

### CLASS CLAIM FOR VIOLATIONS OF SECTION 20 (a) OF THE EXCHANGE ACT AGAINST THE DIRECTOR DEFENDANTS

160.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

161.    During their tenures as officers and/or directors of VCG, each Defendant named in this count was a controlling person of VCG within the meaning of Section 20(a) of the Exchange Act.  By reason of their positions of control and authority as officers and directors of

VCG, these Defendants had the power and authority to cause VCG to engage in the wrongful conduct complained of herein. These Defendants were able to and did control, directly and indirectly, the content of the Proxy Statement and the other solicitations described herein made by VCG, thereby causing the dissemination of the false and misleading statements and omissions of material facts as alleged herein.

162. The Defendants named in this count participated in VCG Board of Directors meetings and conference calls, reviewed the Merger Agreement, and voted to approve the Proposed Transaction, signed the Proxy Statement and solicited approval of the Proposed Transaction.

163. In their capacities as senior corporate officers and/or directors of VCG, and as explained more fully above, these Defendants participated in the misstatements and omissions set forth above. As a result of the foregoing, these Defendants, as a group and individually, are control persons within the meaning of Section 20(a) of the Exchange Act.

164. As set forth above, the VCG directors violated section 14(a) of the Exchange Act, jointly and severally with VCG, and to the same extent as VCG are liable under Section 14(a) of the Exchange Act to Plaintiff and the other members of the Class.

165. Plaintiff and class members eligible to vote on the Proposed Transaction have been denied an opportunity to make an informed decision in voting on the Proposed Transaction and have been damaged as a direct and proximate result of the untrue statements and omissions in the Proxy Statement and other solicitations described herein.

166. By reason of the foregoing, the Defendants named in this count have violated section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

## COUNT V

## INDEMNIFICATION

167. Plaintiff incorporates by reference and realleges all previous allegations as if set forth fully herein.

168. The Director Defendants breached, *inter alia*, their fiduciary duties of care, loyalty and disclosure under Colorado law to the shareholders of VCG.

169. Plaintiffs and members of the Class, as shareholders of VCG, have been harmed by reason of the Director Defendants' breaches of their fiduciary duties.

170. As a result, the Director Defendants should be required to indemnify Plaintiffs and members of the Class.

## COUNT VI

## INJUNCTION

171. Plaintiff incorporates by reference and realleges all previous allegations as if set forth fully herein.

172. Plaintiff requests that the Court issue such injunctive orders as are necessary to restrain and enjoin Defendants from consummating the Proposed Transaction.

**WHEREFORE**, Plaintiff demands judgment as follows:

a. Declaring, as to the first count, this to be a proper class action and certifying Plaintiffs as Class representative;

b. Ordering the Director Defendants to fulfill their fiduciary duties to Plaintiffs and the other members of the Class by announcing their intention to:

   (i)   Cooperate fully with any entity or person having a bona fide interest in

proposing any transactions that would maximize shareholder value, including, but not limited to, a merger or acquisition of VCG;

(ii)    Adequately ensure that no conflicts of interest exist between the Director Defendants' own interests and their fiduciary obligation to maximize shareholder value or, in the event such conflicts exist, to ensure that all conflicts of interest are resolved in the best interests of the public stockholders of VCG; and

(iii)    Act independently so that the interests of the Company's public stockholders will be protected;

c.    Ordering the Director Defendants, jointly and severally, to account to Plaintiffs and the Class for all damages suffered and to be suffered by them as a result of the acts and transactions alleged herein;

d.    Awarding Plaintiff the costs and disbursements of this action, including a reasonable allowance for Plaintiff's attorneys' and experts' fees; and

e.    Granting such other and further relief as may be just and proper.


Dated: January 6, 2011                          Respectfully submitted,

                                         ___/s/ Kip B. Shuman_____
                                         Kip B. Shuman
                                         Rusty E. Glenn
                                         THE SHUMAN LAW FIRM
                                         885 Arapahoe Avenue
                                         Boulder, CO  80302
                                         Telephone: (303) 861-3005
                                         Facsimile:  (303) 484-4886
                                         Email: Kip@shumanlawfirm.com

                                         *Local Counsel for Plaintiff*

Charles J. Piven
BROWER PIVEN
  A Professional Corporation
1925 Old Valley Road
Stevenson, Maryland 21153
Telephone: (410) 332-0030
Facsimile: (410) 685-1300
Email: piven@browerpiven.com

David A.P. Brower
BROWER PIVEN
  A Professional Corporation
488 Madison Avenue, Eighth Floor
New York, New York 10036
Telephone: (212) 501-9000
Facsimile: (212) 501-0300
Email: brower@browerpiven.com

***Counsel for Plaintiff***

## CERTIFICATION OF ANDREW DOYLE

## PURSUANT TO FEDERAL SECURITIES LAWS

I, Andrew Doyle, being duly sworn, do hereby state as follows:

1. I currently hold shares of VCG Holding Corp. ("VCG" or the "Company") common stock and have held such shares continuously since at least _10/20/08_ .
2. I did not purchase the securities that are the subject of this action at the direction of Plaintiff's counsel or in order to participate in any private action.
3. I am willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.
4. Attached in Schedule A are my transactions in the securities that are the subject of this Complaint.
5. I intend to actively monitor and vigorously pursue this action for the benefit of the class.
6. I have not sought to serve as a lead plaintiff and representative party on behalf of any class in any actions under the federal securities laws filed during the three-year period preceding the date of this Certification.
7. I verify that I have reviewed the foregoing verified class action complaint, and that the allegations as to me and my own actions are true and correct and that the other allegations upon information and belief are true and correct.
8. I have retained Brower Piven, A Professional Corporation in connection with this litigation. I have reviewed and authorized the filing of a verified class action complaint against the above-listed defendants.
9. Neither I, nor anyone else affiliated with me, have received, been promised or offered, and will not accept any form of compensation, directly or indirectly, for prosecuting or serving as a representative party in the Action except for (i) such damages or other relief as the Court may award me as a member of the Class; (ii) such fees, costs or other payments as the Court expressly approves to be paid to or on my behalf; or (iii) reimbursement, paid by my attorneys, of actual and reasonable out-of-pocket expenses incurred by me directly in connection with prosecution of the Action.

I make this Affidavit under penalty of perjury that the foregoing is true and correct.

Executed this _3rd_ day of January, 2011.

_Andrew Doyle_ (signature)
Andrew Doyle

SWORN TO AND SUBSCRIBED

before me this _____ day of January, 2011.

Notary Public

My Commission Expires:_

## SCHEDULE A

[LIST OF DOYLE'S TRADES IN VCG]

**SCHEDULE A**

ANDREW DOYLE

VCG Holding Corp.

Schedule of Transactions

| DATE | TYPE | SHARES | PRICE |
|---|---|---|---|
| October 20, 2008 | BUY | 2,500 | $2.66 |
| May 4, 2009 | SELL | 700 | $2.25 |